FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

98 MAY 26 PM 3:59

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| MICHEALL YOUNG, ET AL., ) | |
| PLAINTIFFS, ) | |
| VS. ) | CV96-H-365-NE |
| AMOCO CHEMICAL COMPANY, INC., ) | |
| DEFENDANT. ) | |

ENTERED

MAY 26 1998

## MEMORANDUM OF DECISION

On March 2, 1998 defendant Amoco Chemical Company, Inc. ("Amoco") filed a motion for summary judgment. In accordance with this court's March 6, 1998 order, the motion was deemed submitted, without oral argument, to the court for decision as of April 3, 1998.[1]

On April 2, 1998 Amoco filed a motion to strike portions of plaintiffs' brief in opposition to the motion for summary judgment. Plaintiffs filed a response to the motion to strike on April 7, 1998, asserting that all challenged factual statements are within the admission exception to hearsay in Rule 801(d)(2). Defendant's motion to strike is due to be granted and will be discussed below in the context of the evidence being challenged.

---

[1] On March 2, 1998 Amoco filed a brief along with excerpts from the deposition of Boisvert and Huff and an affidavit by Huff in support of its motion. On March 27, 1998 plaintiff filed their evidence in opposition to the motion, which included: defendant's responses to plaintiffs' interrogatories; excerpts from the depositions of Huff, Michaell Young, Boisvert, Gregory Penton, Tracy Mullins, Jon Brown, Frank Charlton and Jerry Stilley; along the report of Dr. Bryan Forrester, Rust Construction Company and Nachman Brautbar.

29

Plaintiffs commenced this action on January 31, 1996 by filing a complaint in the Circuit Court of Morgan County, Alabama. Amoco removed the case to this court on February 14, 1996 based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs amended the complaint on May 15, 1996 to add James Coby as a plaintiff and again amended it on July 10, 1996 to correct a plaintiff's name. Upon defendant's motion, plaintiff Jerry Mac Ledbetter was dismissed on January 9, 1998. Based on the information provided by plaintiffs' counsel during the January 15, 1998 pre-trial conference the court dismissed the tortious breach of contract claims by plaintiffs, contained in all the odd numbered counts of the complaint. See January 16, 1998 Order. Currently all that remains in this case is a negligence claim by each of the twelve remaining plaintiffs against Amoco arising out plaintiffs' exposure to chemicals on November 7, 1995.

**FACTUAL BACKGROUND**

The following basic facts are undisputed: Rust Construction Services ("Rust") was an independent contractor for Amoco performing work in Amoco's Decatur, Alabama plant. Plaintiffs were working as Rust employees in the wastewater treatment area of the Amoco plant on July 7, 1995. See Young depo. at 58-60; Huff depo. at 25; Boisvert depo. at 14. The plaintiffs were performing construction work on feed water pumps for wastewater treatment control in the 1701 basin area. Id.

On July 7, 1995 chemicals were released in the wastewater treatment area while plaintiffs were performing work. Plaintiffs complained to the Rust foreman of a strong odor.[2]

In the morning of July 7, 1995, prior to Rust employees beginning any work in the waste water treatment area, Bobby Huff, an operator for Amoco, checked out the area by taking samples. See Huff depo. at 37. According to Huff, his sample testing for

---

[2] Both plaintiffs and defendant state this general fact in their briefs but neither side identifies the source or recipient of the information or exactly when the complaint was lodged. In his deposition Gary Penton stated that after lunch on July 7, 1995 he smelled a strong odor and later rode with John Taylor, a safety tech for Rust, to the area in order for Penton to show Taylor where he had smelled the gases. See Penton depo. at 48. Michaell Young testified that he told his foreman and "the safety man" about the strong odor. See Young depo. at 59-60. Yet, there is no verified evidence as to who first reported the chemical release, to whom they reported (other than by stating "a Rust foreman" or "safety man") and exactly when Rust and Amoco became aware of the chemical release.

Plaintiffs' Submissions include an August 9, 1995 report by Dr. Brian Forrester in letter form to an attorney not involved in this case and an investigative report entitled "July 8, 1995 Event at Amoco, Decatur." See Ex. G and H of Plaintiffs' Submissions. These two reports contain some additional details about the release incident, but are not authenticated properly and neither party expressly relied on the facts set forth in these reports, other than plaintiffs' reliance on the reports' statements that approximately 1000 gallons of "organic solvent" were pumped into the area during a four hour period prior to the sensor malfunction being discovered. See Plaintiffs' Brief at p.14; Ex. G and H of Plaintiffs' Submission.

According to Penton, as he and Taylor were driving within ten feet of the area Taylor's monitor "pegs out of over eighty parts per million." See Penton depo. at 48. In their brief, plaintiffs stated that Michaell Young observed "the meter . . . pegged out at over 480 parts per million." See Plaintiffs' Brief at 15. However, this statement is totally unsupported, unexplained and the deposition page cited was not provided to the court.

early July 7, 1995, indicated no benzene or toluene present and detected only a trace of xylene.[3] Id. at 52.

At some time during the afternoon of July 7, 1995 and after the plaintiffs reported a strong odor to a Rust foremen, John Taylor, a safety tech for Rust, contacted Roland Boisvert, a Rust industrial hygienist. See Boisvert depo. 5, 14, 16. Taylor notified Boisvert by radio that there was a release at the treatment lagoon that needed his immediate attention. Id. According to Boisvert, at that time Taylor stated that he had begun barricading off the area and evacuating personnel. Id. at 15. Boisvert estimated that he arrived at the site within 3 to 5 minutes after the report by Taylor. Id. By the time Boisvert arrived on the scene Amoco had already conducted a Drager tube sample test and had sent for the operator to come conduct tests using the hand-held gas chromatograph. Id. at 20-21.[4]

---

[3] From the evidence provided, it is not clear what type of samples Huff collected and what instrument he used in testing. Boisvert, an industrial hygienist for Rust, testified that on the day of the incident he ran daily samples. See Boisvert depo. at 19. It is equally unclear as to Boisvert's protocol and what results were obtained prior to the chemical release.

Amoco presents some evidence concerning Boisvert's use of organic vapor monitors ("OVMs") to monitor the area where the chemical release occurred. See Boisvert depo. at 14. OVMs are described as button type devices wore by individuals working in the area that monitor personal exposure levels by the amount of chemicals trapped on the charcoal inside the OVM. Id. at 19 & 79. Boisvert explains that as of July 7, 1995, the air sampling results from the OVMs did not warrant using an OVM on each employee to perform daily bulk sampling. Id. at 15-16 & 19. Thus, it remains ambiguous as to whether OVMs were the daily samples referred to by Boisvert. Id. at 19.

[4] The parties have failed to provide the court with sufficient evidence and explanation as to these tests, the

The next day, July 8, 1995, Dale Loundermilk of Amoco informed all persons working in the anaerobic reactor area that there was a release in the area where they were working as a result of a sensor failure. See Boisvert depo. at 38. Loundermilk stated that the sensor failure allowed an unknown quantity of xylene to discharge into the lagoons. Id. Xylene is a product derived from petroleum that is used in Amoco's process to form PTA, a purified acid.[5] Id.

Boisvert testified that 100 parts per million is the permissible exposure level for xylene, with a level of 900 parts per million creating immediate danger to one's life and health. Id. at 39. According to Boisvert, the signs and symptoms

---

results and other details. Plaintiffs appear to be arguing that Huff's test using the Draeger tube indicated benzene at a level greater than five parts per million. See Plaintiffs' Brief at p.14. Yet, the excerpts of Huff's deposition provided to the court fall short of fully supporting that factual statement. See Huff depo. at 68-69. Boisvert's testimony indicates that one part per million per an eight-hour day is the acceptable OSHA limit for exposure to benzene. See Boisvert depo. at 72. According to Boisvert on the day of the release, Amoco's testing with a Draeger pump produced results of a benzene level exceeding the limit. Id. Boisvert warned that such readings simply trigger the need for more sophisticated testing equipment to be used to provide better analysis due to cross-interferences. Id. at 20 & 72.

Boisvert testified that Huff's photoionization detector test ("PID") indicated 240-260 parts per million of Benzene, but the results must be divided in half for a reading of 120 to 130 to factor in calibration. See Boisvert depo. at 45. Plaintiffs cite this testimony as showing a true reading of 240 to 260. Thus, the results of any such tests and their significance remain in dispute.

[5] According to Boisvert, PTA is used in products such as Nomex, Gortex, Pepsi bottles, plastics and polyurethane. See Boisvert depo. at 38.

5

indicative of overexposure to xylene include headaches, dizziness, nausea, ringing in the ears, mucus irritation, stinging or burning of the eyes, and aggravation of the nose. Id. Boisvert described these symptoms as similar to the flu, a common cold or a bad hangover. Id.

After being evacuated, some Rust employees began experiencing flu-like symptoms, including nausea, feeling heavy in the chest and a sense of being light-headed. See Stilley depo. at 77. On July 8, 1995 plaintiffs complained of symptoms from chemical overexposure and were carried by Rust to the hospital.[6] See Boisvert depo. at 32-33.

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The

---

[6] Plaintiff Jerry Stilley testified that immediately following the evacuation on July 7 he and a few other Rust employees asked "J.D." if there was a problem and if they should go to the emergency room and be "checked out" because they were all sick. Stilley stated that "J.D." responded by saying it was just a smell and there was no need to go to the emergency room. See Stilley depo. at 76. According to Stilley, J.D. assured them that there was nothing harmful in the pond and that they should all go home. Id. Due to the parties' failure to adequately identify "J.D." the court is not sure whether this information is evidence of negligence by Amoco.

party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.

    The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249.

    The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only

7

meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. <u>Fitzpatrick</u>, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

    If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

    The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the

8

non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, ___ U.S. ___, 116 S. Ct. 2175 (1996).

### B. Analysis of Plaintiffs' Negligence Claims

Plaintiffs remaining claims assert that Amoco was negligent in a number of ways. Under Alabama law negligence is the failure to do what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something which a reasonably prudent person would not have done under the same or similar circumstances. Sanders v. Scarvey, 284 Ala. 215, 224 So. 2d 247, 250 (1969). In order for plaintiffs to prevail on their negligence claims, they must prove: (1) defendant owed a duty to the plaintiffs; (2) defendant breached that duty; and (3) plaintiffs were injured as a consequence of that breach. Sammons v. Garner, 284 Ala. 131, 222 So. 2d 717 (1969).

Based on the evidence submitted the only information the court has before it concerning the relationship between Amoco and Rust, employer of plaintiffs, is the simple undisputed statement by the parties that Rust was an independent contractor for Amoco and was performing construction work at an Amoco site under a

contractual relationship. Neither party has submitted any portion of the contract between Amoco and Rust. Based on this information, the only duty that Amoco has to plaintiffs would be its responsibility as the premises owner.[7] The parties agree that plaintiffs were invitees of Amoco.[8]

As the premises owner Amoco owes plaintiffs the duty to warn them about the defects or dangers that are hidden from them and about which Amoco either knows or ought to know. Gosset v. Twin County Cable T.V., Inc., 594 So. 2d 635 (Ala. 1992)(citing Secrist v. Mark IV Constructors, Inc., 472 So. 2d 1015 (Ala. 1983)); Chance v. Dallas County, 456 So. 2d 295 (Ala. 1984). Amoco can discharge its duty by informing Rust, plaintiff's employer, of the dangerous condition. Cook v. Branick Mfg. Inc., 736 F.2d 1442 (11th Cir. 1984).

Amoco argues that it had fully discharged its duty to inform

---

[7] Plaintiffs have espoused various legal premises as supporting their claim of a duty on behalf of Amoco, including a master/servant relationship, a general contractor/subcontractor relationship and nondelegable duties. See January 29, 1998 Submission; Plaintiffs' March 2, 1998 Brief. Based on plaintiffs' brief, they concede that there is no master/servant relationship, in that Amoco does not control the manner in which plaintiffs performed the work. Therefore, based on the relevant case law Amoco owes plaintiffs no general duty to provide a safe work place. Gordon v. Davis, 585 So. 2d 893, 895 (Ala. 1991). While all parties seem willing to treat the relationship between Amoco and Rust as a general contractor and subcontractor, the court has no evidence that Amoco was serving as a general contractor as opposed to simply contracting work to be done on its own behalf.

[8] An invitee is one who is "on the premises at the express or implied invitation of the owner or occupier for a material or commercial benefit to an occupier." Bates v. Peoples Sav. Life Ins. Co., 475 So. 2d 484, 485 (Ala. 1985).

10

Rust, and therefore had no duty to plaintiffs because Rust was "clearly aware of the chemicals that were used and processed at the Amoco plant." See Defendant's Brief at p.12. Amoco relies on the fact that prior to the chemical release Rust had on file MSDSs (Material Safety Data Sheets) providing a list of the chemicals located at the plant and stating the potential hazards resulting from excessive exposure. See Boisvert depo. at 30 & 51. At the employees' requests MSDSs were given to them by Boisvert on behalf of Rust on the day of the chemical release. Id. at 30.

The court deems this abrogation of responsibility as going too far. While it is true that the MSDSs would generally warn plaintiffs of potential hazards associated with various types of chemical exposures, this general precautionary information cannot substitute for detailed, timely information and prompt reaction to a specific type of chemical exposure. In other words, providing workers with a list of numerous chemicals on site at the Decatur, Alabama Amoco plant and informing them of the potential hazards that could result from excessive exposure to any of those chemicals does not preclude any potential basis for negligence in relation to a particular chemical release.

Amoco owes the plaintiffs a qualified duty to use reasonable care to maintain the premises in a reasonably safe condition. Knowles v. Beatty, 484 So. 2d 370, 371 (Ala. 1985).

> "The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and

11

>would not be observed by him in the exercise of
>ordinary care. The invitee assumes all normal or
>ordinary risks attendant upon the use of the premises,
>and the owner or occupant is under no duty to
>reconstruct or alter the premises so as to obviate
>known and obvious dangers, nor is he liable for injury
>to an invitee resulting from a danger which was obvious
>or should have been observed in the exercise of
>reasonable care." . . . The entire basis of any
>invitor's liability rests upon his superior knowledge
>of the dangers which cause the invitee's injuries.
>Therefore, if that superior knowledge is lacking, as
>when the danger is obvious, the invitor cannot be
>liable.

Quillen v. Quillen, 388 So. 2d 985 (Ala. 1980) (quoting Lamson & Sessions Bolt Co. V. McCarty, 234 Ala. 60, 173 So. 388 (1937)). Defendant points out that Amoco owes plaintiffs no duty of care with respect to working conditions arising during the progress of the work on the contract. Pope v. City of Talladega, 602 So. 2d 890 (Ala. 1992); Terrell v. Georgia Power Co., 567 So.2d 290 (Ala. 1990). Yet, there has been no evidence to indicate that any performance of construction work by Rust employees caused or even contributed to the chemical release.

According to plaintiffs, in this action they are asserting that defendant was negligent in breaching the following duties: (1) to provide respirators; (2) to provide a safe place to work; (3) failing to adequately inspect and supervise its employees and their work; (4) failing to eliminate dangerous and unsafe working conditions; and (5) failing to warn plaintiffs of the dangerous and unsafe working conditions. See Plaintiffs' January 29, 1998 Submission, p.6.[9] As merely a premises owner Amoco has no

---

[9] Plaintiff also makes mention of Amoco's failure to comply with Occupational Safety and Health Act ("OSHA") standard. As

obvious duty to provide plaintiffs respirators and plaintiffs have failed to demonstrate any specific basis from which such a duty arises.[10]

In relation to the other four duties described by plaintiffs, the court concludes that these are all basically asserting Amoco's underlying duty as a premises owner described above. Amoco's responsibility is to make reasonably safe or warn of defects which are known or should be known to Amoco, but remain unknown to Rust and/or plaintiffs and could not be made known to Rust and/or plaintiffs based on the exercise of ordinary care. If such hidden or unknown defects are a result of improper inspection or supervision of Amoco employees then Amoco can be liable. Otherwise Amoco has no obligation to plaintiffs in relation to its inspections or supervision of employees or to eliminate hazardous working conditions.[11]

---

defendant points out the violation of an OSHA standard does not create a private civil remedy. <u>Knight v. Burns Kirkley & Williams Const. Co., Inc.</u>, 331 So. 2d 651, 654 (Ala. 1976). However, evidence of an OSHA standards may be admissible concerning the question of the proper standard of care that defendant should have followed. <u>Id.</u>

[10] Plaintiffs were fitted for respirators when they began working onsite at Amoco. <u>See</u> Boisvert depo. at 25. According to Boisvert his daily tests of the wastewater treatment area had for months prior to July 7, 1995 indicated that no respirators were necessary. <u>Id.</u> at 25-26. Amoco's efforts in fitting Rust employees with respirators initially does not necessarily provide any continuing duty of providing such safety equipment.

[11] Based on plaintiffs' arguments it appears that plaintiff is using the term "working conditions" to include the physical surroundings near where the work is occurring and not using that term to refer to the actual conditions or manner in which plaintiffs performed their construction work.

13

Based on the factual evidence presented it is impossible at this time for the court to determine whether as a matter of law Amoco was negligent in its maintenance of the premises of its plant prior to the July 7, 1995 chemical release in a manner that caused the release and provided superior knowledge as to this particular danger or whether Amoco acted negligently (based on its superior knowledge) in responding once it had actual or constructive knowledge of the July 7 chemical release. It is undisputed that Amoco had actual knowledge of a problem and possible chemical release at some point (likely in the afternoon) of July 7.[12] Yet, there is insufficient evidence for the court to conclude exactly when Amoco had actual knowledge, the extent of that knowledge and if the circumstances prior to that time were sufficient to constitute constructive knowledge before the time of actual knowledge.[13]

---

[12] Plaintiff argues that the court should presume notice because defendant or its employees affirmatively created the dangerous condition. Dunklin v. Winn Dixie of Montgomery, Inc., 595 So. 2d 463, 465 (Ala. 1992). Based on the evidence before the court, plaintiff has failed to present substantial evidence that the defendant's actions created the hazardous condition. However, it is not the matter of having notice that is at issue, but a determination of when notice occurred in order to determine if Amoco's responded in a negligent manner.

[13] Plaintiff asserts that the fact that the chemical release occurred over a four hour period was sufficient to impute constructive knowledge. See Plaintiffs' Brief at 14. While the duration of the chemical release is evidence supporting constructive knowledge, that fact alone, without more evidence of the circumstances surrounding the release, is not sufficient to impute that Amoco should have known about the release and plaintiffs' presentation of the evidence does not indicate when in that four hours plaintiffs are asserting that Amoco should have known of the release.

14

Plaintiffs state in their brief that Mullins's testimony provides evidence of actual knowledge of a defective sensor well before the July 7 release. In his deposition Tracy Mullins testified that a "gentleman" from Amoco told Mullins and others that "they" knew two weeks prior to the July 7 release that the sensor was inoperable, but they went ahead and drained the tank. See Mullins depo. at 134. Defendant's motion to strike objects to this evidence as inadmissible hearsay. Plaintiff asserts in his April 7, 1998 response that this statement is admissible under the hearsay exception of 801(d)(2)(a),(c) and (d). In the deposition Mullins gives a physical description of the declarant based on height, hair color, approximate age and build, then loosely refers to him as an Amoco "supervisor over that area." See Mullins depo. at 77-78. Yet plaintiffs provide no specific identification of the declarant in the brief to enable the court to determine the scope of any agency, as necessary to evaluate the applicability of the hearsay exceptions cited. Zaken v. Boerer, 964 F.2d 1319, 1322-24 (2d Cir. 1991); Riley v. Kmart Corp., 864 F.2d 1049, 1055, n.8 (3d Cir. 1988). Thus, Mullins's statement is due to be stricken. Likewise, the statements by Jon Brown and Frank Charlton are also due to be stricken for the reasons stated above. See Plaintiffs' Brief at p. 13-14, Brown depo. at 44; Charlton depo. at p.83.

### III. CONCLUSION

After a thorough review of the evidence and briefs submitted by the parties, the court concludes that both plaintiffs and

15

defendant disappointingly failed to adequately develop the factual evidence necessary for this court to determine if plaintiffs have sufficient evidence of negligence by Amoco.[14] As explained above, the questions that remain unresolved in relation to the evidence presented are:

(1) When did Amoco know or should it have known about the actual existence of the chemical leak or the inevitable eventuality of such a leak?

(2) How did Amoco learn this information and who did Amoco learn it from?

(3) What did Amoco do in response to this information?

(4) When did Rust know or should it have known about the actual existence of the chemical leak?

(5) How did Rust learn this information and who did Rust learn it from?

(6) What did Rust do in response to this information?

(7) What possible actions should Amoco have taken to respond in a reasonable manner?

Additionally, there appears to be a material issue of fact as to the actual readings from tests monitoring the chemical exposure following the release on July 7.

Based on the evidence presented defendant is entitled to

---

[14] This disappointment is enlarged by the disappointment in plaintiffs' counsel earlier expressed in the January 16, 1998 order and the disappointment in defendant's counsel not fully developing the undisputed facts that might have allowed defendant to prevail in this action by being given a second opportunity to file a motion for summary judgment armed with the legal arguments in plaintiffs' January 29, 1998 submission.

summary judgment to the extent that plaintiffs' negligence claim are premised on any duty or basis other than Amoco's duty to plaintiffs as invitees on its premises.  Otherwise, defendant's motion for summary judgment will be denied.  A separate order will be entered.

DONE this 26th day of May, 1998.

SENIOR UNITED STATES DISTRICT JUDGE